Brad M. Johnston
Nev. State Bar No.8515
bjohnston@shjnevada.com
Simons Hall Johnston PC
22 State Route 208
Yerington, NV 89447
Telephone: (775) 463-9500

Maria F. Elosu
CA State Bar No.342086
mariaelosulaw@gmail.com
1807 Santa Barbara Street, CA 93101
Telephone (805) 729-6498
*Pro Hac Vice Forthcoming*

Robert L. Brace
CA State Bar No. 122240
rlbrace@rusty.lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 886-8458
*Pro Hac Vice Forthcoming*

Attorneys for Plaintiffs and all others similarly situated

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **PMM3, LLC**, a Nevada limited liability company; **PHILOMENA MOLONEY**, an individual; **TRAVIS GOLDRUP**, an individual: and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**WELLS FARGO BANK, N.A.**, a national banking association,<br><br>Defendant. | Case No.<br><br>**CLASS COMPLAINT FOR:**<br><br>1. **AIDING AND ABETTING A FRAUD;**<br>2. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY ARISING FROM AN IOLTA TRUST ACCOUNT; and**<br>3. **NEGLIGENCE**<br><br>**A CLASS ACTION WITH A JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.   Summary of the IOLTA class action against Wells Fargo............................1

II.  Jurisdiction and venue ................................................................................9

III. Parties..........................................................................................................9

IV. Agency allegations....................................................................................10

V.  Information allegations.............................................................................11

VI. Class action allegations............................................................................11

VII. Claims.......................................................................................................13

      First Claim. Aiding and abetting a fraud by lawyer using an IOLTA Account..........13

      Second Claim. Aiding and abetting breach of fiduciary duty ............................14

      Third Claim. Negligence...............................................................................16

VIII. Prayer for relief.......................................................................................16

IX.  Jury demand.............................................................................................17

## I.

## SUMMARY OF THE IOLTA CLASS ACTION AGAINST WELLS FARGO

1. This is a class action. It is brought by the named plaintiffs – PMM3, LLC, Travis Goldrup, and Philomena Moloney ("Plaintiffs") - on behalf of approximately 200 similarly situated investors against Defendant Wells Fargo Bank, N.A. The class of investors lost over $100 million of their money deposited for their protection into an Interest On Lawyers' Trust Account ("IOLTA") at Wells Fargo Bank. The IOLTA account was in the name of Beasley Law Group, PC and was at the Las Vegas, Nevada branch of Wells Fargo (hereinafter the "Beasley IOLTA 9558 Account" or "Account"). The trust Account was promised to be used for the deposit of Plaintiffs' funds, and its existence and use was important to the Plaintiffs. But, the trust Account was actually used by a criminal enterprise to give an air of legitimacy to a Ponzi scheme that operated from no later than January 1, 2017, to March 3, 2022. The Ponzi scheme is referred to as the "Beasley/Judd Ponzi scheme."

2. The Beasley/Judd Ponzi scheme ended on March 3, 2022, when Nevada attorney Matthew Wade Beasley of the Beasley Law Group, PC admitted he defrauded his client investors while speaking on the telephone with a hostage negotiator as he laid on the ground with a pistol on his chest bleeding from 2 gunshot wounds inflicted by authorities. Beasley was arrested by the FBI after a long standoff where he was threatening suicide because the fraudster did not want to go to jail. Once arrested the scheme collapsed. Ponzi schemes, along with the demented dreams of their operators, always ultimately collapse.

3. The Ponzi operators were, among others, Matthew W. Beasley ("Beasley") and Jeffrey J. Judd ("Judd") of J and J Consulting Services, LLC. Beasley operated the law firm receiving the stolen money and Judd solicited the customers, directed down-the-line sales brokers, and made lulling interest payments back to investors out of J and J Consulting Services, LLC ("J and J Consulting") accounts, including a lulling payment account held at Wells Fargo Bank.

4. On April 13, 2022, the Securities and Exchange Commission ("SEC") filed litigation against, among others, Beasley and Judd seeking to restrain their access to bank accounts and assets acquired with stolen money, to force them to account for the sources and uses of stolen funds and prohibiting them from destroying evidence. See the related matter of

1

CLASS ACTION COMPLAINT

*SEC v. Matthew Beasley,* et al. Case No. 2:22-cv-00612-JCM-EJY pending in this Court. Plaintiffs incorporate the facts of the fraud asserted by the government in that civil case into the class case at bar.

5. Beasley and Judd are the primary tort feasors who should be incarcerated and unable to respond to the damages suffered by the named plaintiffs and the class. Beasley and Judd had no exit plan. Wells Fargo Bank is sued as a knowing aider and abettor that substantially assisted the breach of fiduciary duties arising out of the existence of the IOLTA created trust by the Beasley Law Group, PC. Beasley and Judd used the Beasley IOLTA 9558 Account as the vehicle to commit their fraud. Beasley and Judd's fraud focused on friends, persons in the construction industry, and members of the Mormon church.

6. IOLTA trust accounts are governed by rules and regulations promulgated by the Nevada Supreme Court. IOLTA trust accounts serve an important public interest. Nevada attorneys and law firms are required to create and maintain an interest-bearing trust account for the deposit of clients' funds which are **nominal** in amount or to be held for a **short period** of time at an approved participating financial institution.

7. Wells Fargo Bank is an approved participating financial institution in the state of Nevada. Wells Fargo participated in the IOLTA program to generate additional accounts and business from the Nevada legal community. As a participating bank, Wells Fargo must calculate and pay the interest earned on the IOLTA accounts to the Nevada Bar Foundation. As an approved financial institution and a bank that must calculate interest earned each month, it may be reasonably inferred and is hereby alleged on information and belief that Wells Fargo Bank monitored the Beasley IOLTA 9558 Account daily, or at a minimum at the end of each month from 2017 to 2022. The monitoring from 2017 to 2022 is the equivalent of knowing about the transactions taking place in the Account. The bank knows what it sees after it looks. After Wells Fargo looked, Wells Fargo knew that Beasley and Judd were operating a Ponzi scheme and Beasley was breaching his fiduciary duty to the clients depositing their money into the Beasley IOLTA 9558 Account.

8. Since 2014, the Nevada Bar Foundation receives, manages, and distributes IOLTA itnerest funds through grants to organizations that provide legally-related services to Nevadans as well as access to justice for those who are unable to afford it. The amount of IOLTA funds received by the Nevada Bar Foundation increased from $2.7 million in 2017 to

$4.9 million by 2021 - during the operation of the Beasley IOLTA 9558 account at Wells Fargo Bank.

9. The Nevada Bar Foundation, through a committee, established a Leadership Program to recognize financial institutions that participate in the IOLTA program. Wells Fargo is a recognized leader in the IOLTA program. In 2019, the Trust Accounting Manual was published by the Nevada State Bar which regulates the use of IOLTA accounts by lawyers and financial institutions. It may be reasonably inferred and is hereby alleged on information and belief that employees of Wells Fargo read the manual.

10. The Trust Accounting Manual recognizes that the willingness of people to trust a stranger (like Matthew W. Beasley) with their money just because the stranger is a licensed attorney in Nevada is critical for the creation of an efficient and productive business and legal environment. As such, maintaining the existence of the publics' trust in lawyers and the legal system is the duty of every individual attorney and a matter of supreme public interest in Nevada. To be able to exploit the public's trust in lawyers with trust accounts was the express purpose of the criminals in using the IOLTA account. Below is the recorded transcript of the sales pitch to Mike (an undercover potential investor) by Jongeward (a paid promoter) of the sale of Beasley and Judd's unregistered securities and Ponzi scheme:

> **MR. JONGEWARD:** Yeah, so we have an attorney that represents us ...
> **MIKE:** Okay.
> **MR. JONGEWARD:** ... we use his IOLTA account, his lawyer's trust account, and that lawyer's trust account is a state bar regulated account. If you're not familiar with those it's ...
> **MIKE:** Yeah.
> **MR. JONGEWARD:** Yeah. It's very similar to an escrow account for real estate.
> **MIKE:** And what's the attorney's name?
> **MR. JONGEWARD:** His name is Matt Beasley, B-e-a-s-l-e-y, Beasley Law Group.
> **MR. JONGEWARD:** ... this is all that Matt (Beasley) does. He puts all the purchase agreements together. ... he works for Jeff, and we use his IOLTA account to pass money back and forth. Then when capital comes in Matt (Beasley), Matt forwards it to Shane and then Shane forwards it to me. So, when I reconcile every week -- for example this week -- I'll give you a little look here. This week I have 51 contracts replacing and we placed about 23 - $680,000 of new contracts as well. So I'll have a total of $553,750 that is going to -- that's going to be paid by me today, and I'll do that through the Wells Fargo direct pay system, kind of a wire system --
> **MIKE:** Okay

11. The Supreme Court of Nevada has recognized that the public has an interest in the bank records of IOLTA accounts as part of maintaining the integrity of the profession. The IOLTA funds are deemed to be held in trust by the lawyer acting in a fiduciary capacity to the

beneficiary owning an equitable interest in the funds deposited at the bank. Nevada Supreme Court Rules require that all members of the state bar establishing an IOLTA account shall direct their depository institution (here Wells Fargo) to remit interest or dividends on the average monthly balance in the IOLTA account, to the designated tax-exempt foundation. To remit interest on the average monthly balance in the account, the bank must look at the deposits and withdrawals out of the account to determine the average monthly balance and calculate the interest to be paid the Nevada Bar Foundation.

12. IOLTA account bank statements show the interest paid to the state bar for the lawyer so the lawyer can reconcile his own trust books. IOLTA accounts prohibit overdraft protection because overdrafts by lawyers using IOLTA trust accounts are strongly prohibited and must be reported to the bar by the bank witnessing the insufficient funds on account. Beasley and Judd knew that one bounced check would destroy the Ponzi scheme by requiring Wells Fargo to report Beasley to the state bar. In response, investors and brokers were recommended by Judd to open Wells Fargo bank accounts to accommodate direct transfers of stolen funds from Wells Fargo accounts to the Beasley IOLTA 9558 Account and back to Judd's Wells Fargo account. Named plaintiff MMP3 opened a Wells Fargo account to transfer funds to the Beasley IOLTA 9558 Account at Wells Fargo.

13. The Declaration of Amir Salimi (accountant for the SEC) filed in support of the SEC's Application for a Temporary Restraining Order outlines Wells Fargo's breaches of the terms of the Trust Accounting Manual and violations of the purpose and directives of the Beasley IOLTA 9558 Account by allowing the lawyer to use the account to run an obvious Ponzi scheme.

14. According to Salimi, from January 2017 to March 15, 2022, Beasley deposited **$491.5 million** into the Beasley IOLTA 5598 account at Wells Fargo. When Beasley opened the trust account in early 2017, he told Wells Fargo he was a solo practitioner with gross sales of no more than **$350,000** per year. Beasley told Wells Fargo his gross sales were no more than **$350,000** per year so Wells Fargo knew that Beasley could not, legitimately, deposit **$491,500,000** - nearly a half of billion dollars - in client trust funds into the account at Wells Fargo.

15. IOLTA accounts are intended to accommodate the deposit of "nominal" client funds for a short period of time whereby the cost to open an individual trust account exceeds the amount of money and time on deposit of the funds. The short-term interest to be earned on

4
**CLASS ACTION COMPLAINT**

$491.5 million is not nominal. The short-term interest earned on the $491.5 million and required to be paid by Wells Fargo to the Nevada Bar Foundation was significant enough to trigger oversight by Wells Fargo and the Bar Foundation.

16. Just prior to the gun battle in early March 2022, that wounded Beasley and resulted in his arrest, Beasley was depositing over **$28 million** per month in client funds into the trust account and withdrawing over **$30 million** per month for his co-conspirators to make lulling payments (interest on investments), to pay cappers, and pay for their extravagant lifestyles. Beasley's extravagant lifestyle included homes in Tahoe and Las Vegas. Judd's perceived lifestyle needs included 4 homes, 2 Bentleys, 1 Rolls Royce, 1 Ferrari and a jet needed to attend his daughter's performances in New York and his son's soccer games in Los Angles. The money used for personal necessities of the criminals came from defrauded investors that included, for many, their entire life savings that they needed to survive into the uncertain future.

17. Salimi testified that the IOLTA account was established in the name of Beasley Law Group, PC as a general IOLTA account. She declared that Matthew Beasley was the sole signatory on the account from the time it was opened on January 26, 2017. The account opening documents bear a handwritten signature of the name "Matthew Beasley." The date listed next to this handwritten signature is January 26, 2017. Beasley is listed as "Owner with Control of the Entity" and as having 100% of ownership of the Beasley Law Group, PC that had **$350,000** per year in gross income. The **$491.5 million,** or a significant portion of it, paid by clients and investors to the Beasley Law Group, PC was stolen by Beasley with the knowing assistance of Defendant Wells Fargo. Wells Fargo's knowledge was acquired as the result of its ongoing obligation to monitor the account as a participating financial institution and recognized leader of the IOLTA program.

18. The monthly Account Summary Statements created by Wells Fargo from the records of Wells Fargo for the Beasley IOLTA 5598 Account identified the $491.5 million in deposits of investors' money as being made to the Beasley Law Group, PC in increments of $40,000, $50,000, $80,000 or $100,000.

19. The deposits of checks and wires of even numbered increments were acknowledge, recorded, and approved by employees of Wells Fargo at the time of each deposit. The Beasley Law Group, PC was the sole payee of these repetitive even numbered deposits. On information and belief Wells Fargo understood that third parties who pay funds owed to clients of lawyers by paying the lawyer directly, often include the client as a co-payee to assure that the

creditor knows the payment was made to his or her lawyer by the debtor-payor. This never occurred at Wells Fargo in the Beasley IOLTA 5598 Account. The regular and systematic checks and wires for $40,000, $50,000, $80,000 or $100,000 were made solely to the Beasley Law Group, PC which would, with 2 IQ points, connote a scam of investments in unregistered "securities" as alleged by the Securities and Exchange Commission.

20. In addition, clients paying fee retainers to lawyers expect the fee to be worked off over time. Beasley was paid $4.1 million per month in 2019, $9.2 million per month in 2020, $20.4 million per month in 2021 and $28.3 million per month in 2022. It would be physically impossible for Mr. Beasley to earn $350,000 per year in 2017 and then millions of dollars per month afterwards in hourly time as a solo law practitioner. The bank had to conclude and exclude the source of funds coming into the account as being client fee advances or unearned retainers. The only explanation for Wells Fargo to grasp in its monthly monitoring was that the trust res consisted of money for investments in unregistered "securities" by defrauded investors as alleged by the Securities and Exchange Commission.

21. Wells Fargo could not have concluded that over $20 million per month in 2021 and 2022 represented settlements payable to Beasley's clients. No clients were named as co-payees and the solo practitioner generating $350,000 per year could not possibly generate settlements for clients exceeding $240 million per year in 2020 and 2021. That would, indeed, result in over $60 million to Beasley if engaged in contingency fees of 25%.

22. None of the deposits into the IOLTA account could be identified as insurance tort settlements. None of the deposits were from law firms, lawyers, or insurance companies. The deposits from investors in even numbered checks and wires included notations in the wire instructions and on the face of the checks that the monies transferred to the lawyer in trust were for "investment purposes." The account was an IOLTA account and not an account to sell unregistered securities. The deposits were inconsistent with any activity related to the practice of law. The deposits were totally consistent with Beasley selling unregistered securities using an IOLTA account with oversight by Wells Fargo and the state bar as proof of the safety of the investment.

23. According to the SEC, the Account Summary Statements showed a clear pattern of suspected Ponzi activity in the Beasley IOLTA 5598 Account that began as soon as deposits were received around late January 2017. The receipt of cash from investors was followed by **immediate** transfers out of the trust account to individuals promoting the investments (cappers).

Beasley's cappers included Judd's firms known as J&J Consulting Services, Inc. (Alaska), J&J Consulting Services, Inc. (Nevada), and/or J and J Purchasing LLC.

24. The pattern of Ponzi activity grew exponentially over the years, as is detailed in agent Salimi's table below. Because Ponzi schemes do not produce any real income, they must constantly grow in scope to pay for the promised interest to prior investors, to pay the cappers' fees, and to fund the luxury items sought after by these persons of low moral character. The average of monthly deposits into the Beasley IOLTA 5598 account grew exponentially as reflected below:

| Beasley IOLTA Account | | |
|---|---|---|
| Wells Fargo - 5598 | | |
| Year | Average Monthly Inflows | Average Monthly Outflows |
| 2017 | 583,907 | (546,036) |
| 2018 | 1,370,127 | (1,291,958) |
| 2019 | 4,147,822 | (4,096,741) |
| 2020 | 9,240,054 | (9,045,776) |
| 2021 | 20,435,193 | (20,317,308) |
| 2022 | 28,399,421 | (30,110,959) |

25. As for the outflows, from January 2017 through March 15, 2022, **$487 million** was disbursed from the Beasley IOLTA 5598 Account in breach of trust. None of the disbursements from the Wells Fargo account were consistent with returning client funds to the clients of Beasley. None of the disbursements were consistent with paying Beasley a fee out of retainer money held in trust. None of the disbursements were related to the practice of law. And, none of the disbursements could be described as advance payments to tort plaintiffs, or their lawyers and associated law firms who had reached PI settlements with insurance companies. Below is a summary of the use of funds from the Beasley IOLTA 5598 account from January 1, 2017, to March 15, 2022. Wells Fargo knew about the disbursements because it physically caused the following transfers out of its IOLTA account:

a. **Jeffrey Judd**, Beasley's co-conspirator, received directly or benefited from disbursements of at least $315.3 million. Judd would pay the lulling payments to

the investors in the Beasley/Judd Ponzi scheme. Payments of trust assets by Beasley to Judd included:

    i. Jeffrey Judd: $131,850

    ii. J & J Consulting Services: $313.7 million

    iii. The Judd Irrevocable Trust: $1.4 million.

    **b.**    **Shane Jager** received directly or benefited from disbursements by Beasley of at least $37.3 million in trust assets including disbursements to:

    i. Shane Jager: $140,500

    ii. Stirling Consulting, L.L.C.: $37.2 million as income and to make lulling payments.

    **c.**    **Christopher Humphries** received directly or benefited from disbursements of at least $31.1 million in trust assets, including disbursements to:

    **i.** CJ Investments LLC: $31.0 million

    **ii.** Bug Raiders Pest Control, LLC: $55,000.

    **d.**    **Matthew Beasley** received directly or benefited from disbursements of at least $17.2 million in trust assets, including disbursements to:

    **i.** Matthew W. Beasley: $80,000

    **ii.** Beasley Law Group, PC: $17.1 million for lifestyle enhancements.

    **e.**    **Denny Seybert** received directly or benefited from disbursements of at least $746,000 in disbursements of trust assets to Rocking Horse Properties, LLC.

    **f.**    **Anthony Michael Alberto**, Jr. received directly or benefited from disbursements of at least $6.8 million in trust assets, including disbursements to:

    **i.** Anthony Michael Alberto, Jr.: $4.0 million

    **ii.** Monty Crew, LLC: $2.9 million.

    **g.**    PAJ Consulting Inc ("PAJ") received at least $824,500.

    **h.**    BJ Holdings LLC received at least $500,000.

    **i.**    ACAC LLC by **Chris Madsen** received at least $11.7 million.

26. Approximately $411 million or 84% of the funds transferred out of the Beasley IOLTA 5598 Account from January 2017 to March 15, 2022 were to entities identified as controlled by the promotors of the scheme as follows: **Judd** from J & J Consulting Services: $313.7 million, **Shane Yaeger** from Stirling Consulting LLC: $37.2 million, **Chris**

**Humphries** from CJ Investments LLC: $31 million, **Beasley** from Beasley Law Group PC: $17.1 million and **Warren Rosegreen** from Triple Threat Basketball, LLC: $12.3 million. Money paid to the cappers was used, in part, to make lulling payments to investors.

27. Funds deposited into the Beasley IOLTA 5598 Account were also used to make direct Ponzi-like "return" payments to investors and to fund Beasley's personal expenses directly out of the Beasley account at Wells Fargo. Such payments included over $4 million to title companies, for the purchase of real estate.

28. Prior to the collapse, Beasley's investors were receiving returns on what they believed to be legitimate investments, and thus, had not yet suffered a known injury on their investment. This action seeks to recover money to benefit the defrauded investors whose money was deposited in the Beasley IOLTA 5598 account at Wells Fargo Bank after Wells Fargo obtained knowledge Beasley was operating a fraudulent scheme - - by imposing liability on Wells Fargo as a co-conspirator, a knowing aider and abettor, a recipient of investors' stolen funds, and a negligent bank.

29. Plaintiffs understand that a bank owes no duty under the Bank Secrecy Act to police a depositor for the benefit of non-depositors. However, some of the named plaintiffs were depositors at Wells Fargo Bank with the money paid to Beasley coming from their Wells Fargo accounts creating an obligation by Wells Fargo to act with competence as to their funds on deposit. As to non-depositor class members, the Plaintiffs allege that once a bank acquires actual knowledge that a depositor is using the bank to steal from non-depositors the financial institution has a duty to non-depositors to, among other things, terminate the banking relationship with the defalcating depositor. At a minimum, a reasonably prudent bank must refrain from assisting in the fraud, which is foreseeably injuring depositors and non-depositors alike.

## II.
## JURISDICTION AND VENUE

30. This Federal District Court may exercise jurisdiction over this Class Action pursuant to 28 U.S.C. § 1332 because the Plaintiffs are residents of Texas and Nevada, and Wells Fargo Bank is a resident of the state of South Dakota for complete diversity. The Court has additional grounds for jurisdiction under the Class Action Fairness Act ("CAFA") because class members reside in multiple states other than South Dakota and the amount in controversy

exceeds $5 million. The residences of the Class members known to the Plaintiffs are Texas, Nevada, Washington, California, and Utah. The perpetrators of the fraud targeted construction workers and members of the Church of Latter-Day Saints ("LDS"). The matter is a complex Class Action.

31. This Court has personal jurisdiction over the defendant named in the Complaint because Wells Fargo Bank conducted business in Nevada, and it participated in a Nevada based fraudulent scheme that injured Nevadans. Venue is proper in this District because the conduct at issue took place and had an effect in this District and Wells Fargo regularly conducted and still regularly conducts substantial banking business in this District.

### III.
### PARTIES

32. **Plaintiff PMM3, LLC ("PMM3")** is a limited liability company doing business in Clark County, Nevada who invested $100,000 in Judd and Beasley's business on January 21, 2021 to be repaid within months and earn interest on the short term investment. PMM3's was told its $100,000 would be deposited into the Beasley IOLTA account at Wells Fargo Bank and the LLC relied on this representation about the use of a monitored trust account as evidence of the security and safety of the investment. The Plaintiff's funds were deposited into the IOLTA account as promised. Beasley and Judd also represented to PMM3 that its investment funds would be used to provide temporary financial relief for a victim of a personal injury. The debt would be repaid after receipt of the funds by the injured victim from the defendant's insurer. Neither Beasley or Judd disclosed to PMM3 that its investment funds would be used to pay back other investors or used for other purposes. Had PMM3 known the truth it would not have transferred its money to the Beasley IOLTA account.

33. **Plaintiff Philomena Moloney ("Moloney")** is an individual living and doing business in Clark County, Nevada and she invested $100,000 in the same Beasley/Judd Ponzi scheme. It was represented to Moloney that her investment would be used to provide temporary financial relief for a victim of a slip and fall accident. It was represented to Moloney that her investment would be deposited into a lawyer monitored trust account called an IOLTA account at Wells Fargo Bank and her money was in fact deposited into such an account at said bank as was represented. Had Moloney known the truth that her investments funds would not be used as represented, she would not have invested her money with Judd and Beasley.

34. **Plaintiff Travis Goldrup ("Goldrup")** is an individual residing in Houston,

Texas who invested $10,000 in Judd's and Beasley's business on October 21, 2020, and another $30,000 on January 10, 2022. Goldrup was to be repaid interest on the short-term investments, but instead allowed the interest to accumulate into additional principal on other loans to personal injury victims in need of the money. Goldrup's $40,000 was deposited into the Beasley IOLTA account at Wells Fargo to be monitored by Wells Fargo as was represented by Judd to Goldrup. Neither Beasley nor Judd disclosed to Goldrup that his investment funds would be used to pay back other investors or used for other purposes. Had Goldrup known the truth he would not have invested his money with Judd and Beasley.

35. Plaintiffs PMM3, Moloney and Goldrup will collectively be referred to herein as "Plaintiffs".

36. **Defendant Wells Fargo Bank** is a national banking association headquartered in South Dakota for purposes of diversity jurisdiction and does substantial business throughout the United States including in the state of Nevada.

## IV.
## AGENCY ALLEGATIONS

37. During the relevant time the employees and agents of Wells Fargo Bank were acting within their course and scope of employment and agency for Wells Fargo.

38. Plaintiffs allege that the actions of the Defendant were done in collaboration and collusion with Beasley and Judd while acting in furtherance of their agreement to perpetuate the unlawful scheme after it was discovered to exist by Wells Fargo as part of its obligations to the bar association and public to monitor IOLTA accounts opened at the bank by lawyers. Wells Fargo's agents working with Beasley and Judd were acting in the course and scope of their employment and agency with Wells Fargo and the Defendant authorized or ratified the acts of its agents as detailed herein.

## V.
## INFORMATION ALLEGATIONS

39. Allegations made in this Complaint have been based on information and belief, except those allegations that pertain directly to the Plaintiffs, which are based on Plaintiffs' personal knowledge. Plaintiffs' information and belief is based on, *inter alia*, the investigation conducted by Plaintiffs and Plaintiffs' attorneys after their retention which was after Beasley was shot. Each allegation and factual contention contained in this Complaint has evidentiary

support or, alternatively, is likely to have evidentiary support after reasonable opportunity for further investigation or discovery by Plaintiffs or their counsel.

## VI.
## CLASS ACTION ALLEGATIONS

40. Plaintiffs bring this action on their own behalf and as Class representatives pursuant to Federal Rules of Civil Procedure, Rule 23. The Class is defined, for now, as:

> Those persons that suffered Net Loss damages by investing money with Beasley and Judd that was deposited into the Beasley IOLTA 5598 account at Wells Fargo Bank (herein referred to as the "Members of the Class" or the "Class Members").

Excluded from the definition of the Class are the Defendant and any person, corporation, or other entity related to, controlled by, or affiliated with the Defendant. Also excluded from the class are "Net Winners" who are persons who invested money with Beasley and Judd and were repaid their principal whereby the amount repaid exceeds the total amount invested. Included in the term "Persons" in the definition of the Class are entities, representatives of these entities and assignees.

41. The members of the Class are so numerous that joinder of all of them is impracticable. There are dozens of Class Members residing in Nevada and elsewhere. At present, it is believed that there are over 200 Class Members.

42. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class Member. The common questions include, *inter alia*, the following:

    a.    Did Beasley and Judd commit a uniform fraud on the persons investing in the Beasley/Judd Ponzi scheme?

    b.    Did Wells Fargo know that Beasley was committing fraud on persons depositing money in the Beasley IOLTA account at Wells Fargo?

    c.    Did Wells Fargo know that Beasley was breaching his fiduciary duty owed to persons depositing money into the Beasley IOLTA account at Wells Fargo?

    d.    Did the Class Members purchase unregistered securities from Beasley and Judd which was assisted by Wells Fargo?

    e.    Did Wells Fargo knowingly provide substantial assistance to the fraud committed by Beasley and Judd by physically accepting and dispersing the investors' money derived from the false promises?

    f.    Did Wells Fargo knowingly provide substantial assistance to Beasley, the lawyer, in breaching his fiduciary duty to his clients who were depositing client funds into the Beasley IOLTA account at Wells Fargo?

43. The claims of the Plaintiffs are typical of the claims of the Class as a whole. The Plaintiffs are members of the Class and have suffered harm and are likely to continue to suffer harm due to the misconduct alleged herein.

44. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are consistent with and not antagonistic to the interests of the Class. Plaintiffs have sought out and retained counsel experienced in complex class actions to recover their damages. Plaintiffs have agreed to act for the benefit of all persons similarly situated and not to put their individual interest ahead of any member of the Class.

45. The prosecution of a multitude of separate actions by individual members may establish incompatible standards of conduct for the parties opposing the Class, may substantially impair or impede the interests of other members of the Class to protect their interests, and may result in waste.

46. The acts and actions of the Defendant applicable to the Plaintiffs apply generally to the Class, thereby making the final relief granted by the Court to the Plaintiffs applicable to the Class as a whole.

47. This Class Action and only this case would be superior to other available methods for the fair and efficient adjudication of the controversy between the parties. The interest of most members of the Class in individually controlling the prosecution of separate actions appears low, due to the complexity of the case. Most members would be unable or unwilling to individually prosecute an action without joining their claims with other claimants which is generally difficult. Separate suits would be impractical because of the number of victims and the dollar amount at stake for each victim. Concentrating litigation in this forum will also promote judicial efficiency.

48. This proposed Class Action is very manageable because the issues at stake for each Class Member are the same, the Class Members lost enough to want to participate, the number of Class Members make prosecution of the collective claims efficient, the documents

establishing liability and the loss amounts are in Las Vegas with Wells Fargo and ultimately the bankruptcy trustee, and the criminal prosecutions of Judd and Beasley will take place in Las Vegas producing more evidence to implicate Wells Fargo.

## VII.
## CLAIMS

### FIRST CLAIM FOR RELIEF
### Aiding and Abetting A Fraud by A Lawyer using An IOLTA Account

49. Plaintiffs incorporate the prior paragraphs as if fully set forth herein. The Plaintiffs must prove two cases – (i) the fraud by the primary tort feasors and (ii) the aiding and abetting of the fraud by the bank. Beasley has admitted to the underlying fraud by Beasley and Judd which admission includes uniform false promises, the reasonable reliance by the Plaintiffs when parting with their money, and the presumption of reasonable reliance for the members of the class pursuant to *Risinger v. SOC LLC*, 708 Fed. Appx. 304 (9th Cir. 2017). The two primary tort feasors (Beasley and Judd) defrauded the investors by falsely promising to invest the proceeds of their investments deposited at Wells Fargo into loans to victims of personal injuries. The investments were ostensibly for humanitarian purposes coupled with a high rate of return. The key for all Plaintiffs to trust Beasley and Judd was their reliance on the true representation that the investors' funds would be deposited into the Beasley IOLTA 9558 trust account monitored by Wells Fargo bank. The Beasley trust account was real. The Beasley IOLTA 9558 trust account was uniformly advertised by Beasley, Judd and the brokers selling the investments as described by Mr. Jongeward when he was interviewed by Mike an undercover investigator. Jongeward said:

> ... we use his (Beasley's) IOLTA account, his lawyer's trust account, and that **lawyer's trust account is a state bar regulated account**. If you're not familiar with those it's ... It's **very similar to an escrow account for real estate.**

50. Within a short period of time after opening the Beasley IOLTA 9558 account, Wells Fargo Bank had actual knowledge of the primary wrong of fraud being committed by Beasley because Wells Fargo knew the funds held in trust were not client funds of a nominal amount held for a short period of time. Wells Fargo knew the trust funds were not being returned to the clients, directed by the Plaintiffs to be paid over to third parties, or consumed by the attorney as fees incurred pursuant to thousands of retainer agreements in increments of

$40,000, $50,000, $80,000 or $100,000. Instead, Wells Fargo knew the account received deposits of hundreds of millions of dollars from an attorney grossing $350,000 per year and the money was then immediately transferred out in large transfers to third parties unrelated to the clients depositing the funds. Wells Fargo knew the account was not the type to allow the lawyer to transfer the interest earned on the funds to the Nevada Bar Foundation for charitable purposes.

51. Within a short period of time after opening the Beasley IOLTA 9558 account, Wells Fargo Bank had actual knowledge that the sources of funds coming into the account were not client fee advances, unearned retainers or settlements from third parties. Based on the flow of the **$491.5 million** into and the **$487 million** out of the account, the only explanation for Wells Fargo to grasp was the same conclusion reached by the SEC after a cursory review of the account - that the money was for investments in unregistered "securities" by investors who trusted Beasley believing he was a Nevada lawyer with a valid IOLTA account monitored by Wells Fargo – **"very similar to an escrow account for real estate."**

52. As the direct and proximate result of Defendant's aiding and abetting the fraud, the scheme ensnared Plaintiffs and the other Class Members causing them to deposit their money with Wells Fargo to be immediately stolen by Beasley and Judd with the substantial assistance of Wells Fargo, and the Plaintiffs were damaged in amounts to be proven at trial. The conduct of Wells Fargo was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs pray for an award of exemplary and punitive damages.

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Breach of Fiduciary Duty

53. Plaintiffs incorporate the prior paragraphs as if fully set forth herein.

54. Beasley was a lawyer and the trustee of the trust used to receive the Plaintiffs funds for investment and to deceive the Plaintiffs. Wells Fargo knew that Beasley was a lawyer and the trustee of the Beasley IOLTA account at Wells Fargo because Wells Fargo opened the account, monitored the debits and credits, and reported the results to the Nevada Bar Foundation before transmitting funds for charitable giving to citizens of Nevada. As a trustee and lawyer, Beasley owed fiduciary duties to the beneficiaries of the Beasley IOLTA 9558 trust account and Wells Fargo new it.

55.  Beasley owed the beneficiaries of the IOLTA trust the duty to use an IOLTA trust only when appropriate and an IOLTA trust was not appropriate for holding the receipt of **$491.5 million** and the disbursement of the **$487 million**. Beasley owed the beneficiaries of the IOLTA trust the duties to: (i) safeguard the trust res as directed; (ii) disburse the funds to the clients or their assigns as directed; (iii) and accurately account for the disbursements.

56.  Within a short period of time after opening the Beasley IOLTA 9558 account, Wells Fargo Bank had actual knowledge of the primary wrong of breach of fiduciary duty being committed by Beasley because **Wells Fargo knew**: (i) that Beasley had told Wells Fargo his gross sales were no more than **$350,000** per year so Wells Fargo knew that Beasley could not possibly deposit **$491,500,000** in client trust funds into the Beasley IOLTA 5598 account at Wells Fargo from early 2017 to early 2022; (ii) none of the deposits into the IOLTA account could be identified as insurance tort settlements, deposits from law firms, lawyers, or insurance companies, in short the deposits were inconsistent with any activity related to the practice of law; (iii) the deposits from investors were in even numbered checks and wires including notations in the wire instructions or on the face of the checks that the monies transferred to the lawyer were for "investment purposes;" and (iv) the deposits were totally consistent with Beasley selling unregistered securities using an IOLTA account with oversight by Wells Fargo and the state bar as a sales pitch to prove the safety of the investment when it was not safe.

57.  Wells Fargo substantially assisted Beasley's breach of fiduciary duty by accepting the **$491.5 million** and disbursing the **$487 million** to the detriment of the Plaintiffs in an amount to be proven at trial. The conduct of Wells Fargo was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs pray for an award of exemplary and punitive damages.

### THIRD CLAIM FOR RELIEF
#### Negligence

58.  Plaintiffs incorporate the prior paragraphs as if fully set forth herein.

59.  Wells Fargo owed a duty of care to all Plaintiffs to act as a reasonably prudent bank under the same or similar circumstances.

60.  After Wells Fargo obtained the actual knowledge that Beasley and Judd were defrauding innocent investors, it had the duty to act like a reasonably prudent bank.

61. A reasonably prudent bank that obtains actual knowledge that a customer is using the bank as the vehicle to defraud investors would immediately terminate its banking relationship with that wrongdoing customer regardless of the reputational costs of being associated with a Ponzi scheme. Wells Fargo breached its legal duty when it failed to terminate Beasley as a depositor as soon as it discovered Beasley was defrauding investors and breaching his fiduciary duties. Instead, Wells Fargo unreasonably maintained a banking relationship with Beasley, which proximately caused the foreseeable harm suffered by Plaintiffs.

62. Wells Fargo failed to act as a reasonably prudent bank, which caused Plaintiffs to suffer losses in an amount to be shown at trial.

# VIII
## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for Judgment against the Defendants as follows:

1. For certification of the Class as defined;
2. For the appointment of Plaintiffs as the Class Representatives and Plaintiffs' counsel as counsel for the Class;
3. For special and consequential damages to Plaintiffs and Class members measured, in part, by the net loss of their investments;
4. For exemplary and/or punitive damages, as applicable;
5. For pre-judgment interest;
6. For costs of this action, including reasonable attorneys' fees as afforded by any applicable law; and
7. For all other relief the Court deems just and proper.

///

///

///

# IX.
# JURY DEMAND

Plaintiffs demand a jury trial.

Dated: April 20, 2022

Respectfully submitted,

/s/ Brad M. Johnston

Brad Johnston
Nev. State Bar No.8515
bjohnston@shjnevada.com
Simons Hall Johnston PC
22 State Route 208
Yerington, NV 89447
Telephone: (775) 463-9500

Maria F. Elosu
CA Bar No.342086
mariaelosulaw@gmail.com
1807 Santa Barbara Street, CA 93101
Telephone (805) 729-6498
*Pro Hac Vice Forthcoming*

Robert L. Brace
CA Bar No. 122240
rlbrace@rusty.lawyer
1807 Santa Barbara Street
Santa Barbara, CA 93101
Telephone: (805) 886-8458
*Pro Hac Vice Forthcoming*

Attorneys for Plaintiffs and all others similarly situated